No. 3859.—P. O. Hebert, Tutor, etc., *v.* J. G. Winn et als.

24   385<br>121   832

A person addicted to intemperance and subject to consequent fits of mental derangement, may make a will, if he be *compos mentis* at the time, and the burden falls upon those who assail such a will to show the existing insanity or incapacity of the testator at the time. A capricious bequest in a will does not constitute proof of insanity in the testator.

Where a will has been made by a citizen of this State, while in another State of the Union, and has been admitted to probate there, or elsewhere before a court of competent jurisdiction, the presumption is that the will was executed and probated in accordance with the law of such State or place, and the party who attacks it, whether directly or indirectly, must defeat such presumption by sufficient proof.

APPEAL from the Parish Court of Iberville. *Adonis Petit,* Parish Judge. *Mathews & Robertson,* for plaintiff. *Sims, Barrow & Pope,* and *A. & E. B. Talbot,* for defendants.

Howell, J. A motion to dismiss this appeal, on several grounds, accompanies the record, but does not seem to be urged by the movers. An examination of the grounds, however, satisfies us that they are insufficient. The delay in filing the transcript arose from the necessity of the appellants to take out a mandamus upon the clerk of the lower court. The parties are all properly before the court, the appeal brought up having been taken on motion in open court at the same time when the judgment was rendered, and the appeal bond is in due form and signed by the security.

Motion refused.

## ON THE MERITS.

Paul O. Hebert, tutor of his minor children, sues to annul the will and the probate of the will of George C. Vaughan, their maternal uncle, on the grounds of imbecility, insanity, and the want of capacity to dispose, arising from habitual drunkenness, and of the want of requisite legal forms.

I. It is contended that the testator was of unsound mind and notoriously insane on the sixth May, 1861 (the date of the will), and incapable of disposing of his propperty by will or otherwise, and that Everard G. Winn, his maternal uncle, for the purpose of evading the laws of Louisiana, and with a knowledge of his incapacity, took him to another State, among strangers, where he extracted the pretended will from him.

The evidence is abundant that during the last ten years of his life Vaughan was an habitual drunkard, and subject to not infrequent attacks of *mania a potu*, but it does not satisfy a majority of the court that he was drunk and of unsound mind on the day when the will was executed. The four members of the family at whose house it was made, are positive as to this point, and the circumstances do not countervail their testimony. One addicted to intemperance, and subject to consequent fits of derangement may make a will, if he be *compos mentis* at the time. 15 La. 88. · It is incumbent on those who assail such a will to show the existing insanity or incapacity at the time, which has not been done in this case. It is shown that Vaughan was a man of at least fair education, and when sober exhibited ordinary intelligence and good deportment. He was in the habit of hunting and fishing, and of visiting in the neighborhood where he was raised, and in the State of Tennessee. Some of the young men among whom he grew up, and with some of whom he was at school, speak of him in very favorable terms, when sober. As said in the case of Hart *v.* Thompson's executor, above cited, in which drunkenness was a ground for action: "The impression made on our minds by the whole testimony on this head is, that even admitting the general insanity of the deceased, which is by no means satisfactorily proved, there is abundant evidence that he was *compos mentis* and fully competent to make a will at the time he made it."

Nor is there proof of any undue influence or fraudulent practices on the part of his uncle, E. G. Winn, to evade the laws of this State and extract the will from him as alleged. The circumstances of their leaving Louisiana together, the making of the will while absent, and their return to the State, as detailed in the record, are rather inconsistent with design, and are not such as to invalidate a will. Winn was the brother of Vaughan's mother, a wealthy lady, had managed her large

property for many years, and was kind and attentive to his intemperate nephew. While it appears that the relations between the testator and his brother-in-law, P. O. Hebert, were not of the kindest. The testimony of the Gillens shows that the making of the will was Vaughan's voluntary act, when Winn does not appear to have been present. "The influence to vitiate the act must amount to force and coercion destroying free agency ; it must not be the influence of attachment or affection ; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act ; further, there must be proof that the act was obtained by this coercion—by importunity which could not be resisted." Jannin on Wills, 114.

The fact that the will was made while the two were out of the State and after the testator had recovered from one of his attacks of delirium tremens, is no proof of an intention to evade the laws of this State. The dispositions of the will are not in conflict with our laws, the dictates of nature or the attachments of the testator.

It is urged, however, that the will itself contains internal evidence of his insanity, in that he left a legacy of $5000 to Miss Missouri Gillen, a stranger of but two days acquaintance. On this point the father of the legatee says: "When he, the testator, said he wished to give Missouri Gillen $5000, I stopped writing, and told him she was not entitled to $5000. He then said that my family had been very kind to him, and that it was none of my business, for he was able to give her $10,000 and not hurt him. Then I wrote the clause."

This may be evidence of caprice or a sudden generous impulse of gratitude, but not of insanity. Very many wills would be annulled if such capricious bequests are proof of insanity. The law does not enter so suspiciously into the motives for every bequest in order to set aside a will.

II. The said will should be governed by the laws of Louisiana ; it has not been proved as required by Louisiana law, and it is not shown to be executed or probated according to Arkansas law, which, not being offered in evidence, must be presumed to be like our own.

By art. 1596 R. C. C. testaments made in foreign countries, or in the other States or Territories of the Union, take effect in this State, if they be clothed with all the formalities prescribed for the validity of wills in the place where they have been respectively made.

In the succession of McCandless, 3 A. 580, the benefit of this provision of law was accorded to a citizen of this State, who made his will in another, during his temporary absence from this, and afterwards returned and died here—there being no dispositson made contrary to our law and the policy of our State. And it seems to be settled that, when a will is once admitted to probate in a court of compe-

tent.jurisdiction in this or another State or country, it creates, *prima facie,* a presumption that the will was executed and probated in accordance with the law of such place, and the party who attacks it, whether directly or indirectly, must defeat such presumption by some sufficient proof. 5 N. S. 48; 6 R. 239; 13 An. 575; Const. U. S., art. iv. § 1.

By arts. 1688 and 1689 R. C. C. testaments made in foreign countries and other States of the Union, can be carried into effect on property in this State, upon being registered in the court of proper jurisdiction and its execution ordered by the judge; and this registry or order will be authorized by the production of a duly certified copy of the proceedings and evidence in proof of the will and probate.  13 L. 221; 17 L. 4, 846; 2 R. 427.  All this seems to have been done in this instance.

Our conclusion is that plaintiffs have not successfully assailed the will, and the probate of the will, of George C. Vaughan, and that the judgment appealed from should be reversed.

It seems that Missouri Gillen, the special legatee, did not prosecute her appeal, and being an appellee we can not correct the judgment as to her and her co-appellees.

It is, therefore, ordered that the judgment appealed from be reversed, and that there be judgment in favor of the heirs of Edward G. Winn herein, the universal legatees of George C. Vaughan, deceased, dismissing and rejecting the demand of plaintiffs; that the will of the said George C. Vaughan be decreed to be valid, and the said heirs of Winn, to wit, Independence G. Winn, Mary Winn wife of Henry Davis, and Alexander Winn and Cordelia Winn, represented by their natural tutrix, Mary Montgomery, widow of Edward G. Winn, be recognized as the universal legatees of the said George C. Vaughan, and entitled to the possession of all of his estate under said will.  Costs of the lower court to be paid by the plaintiffs—those of appeal, by the appellees.

———

LUDELING, C. J., *dissenting.*   I dissent from the opinion of a majority of this court in regard to the capacity of George C. Vaughan to make a will on the sixth of May, 1861.

In my opinion the proof greatly preponderates in favor of the position that George C. Vaughn was an imbecile at the time, before and after he made the will, *if he made it.*

It is proved that for years before his death he was almost always drunk, and that he had several attacks of *mania a potu;* and the effort of the defendants in the court *a qua* seemed to be to find some one who had ever seen him when not under the influence of liquor.   It

is proved that in the latter part of the month of April, 1861, he had a violent attack of *mania a potu* while in the city of Memphis, and that he was attended then by Doctors Yandell and Erskin. They state that after his recovery from said attack he was weak, mentally and physically, and that up to the period when they last saw him, the first of May, 1861, he was not capable to make dispositions of his property. The will was made on the sixth of May.

Dr. Hall, who had been the family physician of Vaughan's mother, says he attended Vaughan several times when he had *mania a potu*, that he had known him many years before his death, and that for years before his death he was an imbecile, incapable of attending to any business. This evidence is corroborated by the testimony of Crowell, Cocker and Mrs. Cocker, Hebert, Besson and others. And several of the witnesses mention acts done by Vaughan, when apparently sober, which indicated want of capacity to transact the most ordinary business.

The evidence further shows that, after the death of the mother of Vaughan, E. Winn, the maternal uncle of Vaughan, said he would see to it that George C. Vaughan's share of the mother's property should go to his own children. The Gillen family testified that they did not know George C. Vaughan before he was brought to their house; that they had never heard of him until their uncle told them he was going to Memphis to bring him to their house. They testify that he was brought to their house on the third of May. Mrs. Gillen says she can not tell whether he was then drunk or not; that he was *nervous* and was sick, and that he remained nervous for three or four days after his arrival at their house. The will was made on the sixth of May, and Vaughan appears to have left their house shortly afterwards, for he is shown to have been in New Orleans about the fourteenth of May, drunk, dirty and ragged, and to have continued drunk until the attack of sickness of which he died, in June. The only witnesses who attested the will who testified in this case, are the members of the Gillen family, in favor of one of whom a legacy of five thousand dollars is made in the will. All the other witnesses are said to be dead or to have left the country, and the *original will* itself could not be found in the office in Arkansas, where it should have been if in existence. Why was George C. Vaughan taken from Memphis, in the condition he was in, to Gillen's landing, an obscure place, where a few wood-choppers and levee builders were staying? And why should he have employed Gillen to write his will when it appears from Gillen's own testimony that he was instructed by Vaughan as to the requisites of the will by the laws of Louisiana? And why the bequest of five thousand dollars in favor of Missouri Gillen, whom he had never met until a day or two before? It requires more credulity than I possess to believe that the will was the

voluntary act of George C. Vaughan. While, on the other hand, the evidence satisfies me that he had not the necessary capacity to make a will on the sixth of May, 1861.

I concur in the dissenting opinion of the Chief Justice in this case.